[No. 3514.]

Jeff Boles v. The State.

Aggravated Assault — Charge of the Court.— In a trial for aggravated assault wherein the testimony tended strongly to show that the alleged injured party was beyond the reach of danger from the means used, the trial court charged the jury as to the statutory meaning of an assault, but failed to explain the statutory definition of the terms " coupled with an ability to commit" it. *Held*, that the omission was error; and see the statement of the case for a special charge which, correctly stating the law upon the subject, was erroneously refused.

Appeal from the County Court of Johnson. Tried below before the Hon. B. D. Simpson, County Judge.

The conviction was for an aggravated assault upon one James Noah, at Johnson county, Texas, on the 13th day of December, 1884. A fine of $250 was the penalty imposed by the verdict.

James Hill was the first witness for the State. He testified that he was present in his brother's store, in Grand View, Johnson county, Texas, on December 13, 1883, and saw the difficulty which then and there occurred between the defendant and Jim Noah. A few moments before the difficulty occurred, the defendant came into the store to buy some salt. He and witness were standing inside the store, some ten feet from the front door, when Noah walked in, and took his position about six feet distant from the defendant. Defendant then had his hands up to his breast. Noah asked defendant: " Was what you said in John Ross's store yesterday meant for me?" Defendant replied: " Yes, by G—d," and Noah drew his pistol instantly and fired. Defendant jumped back, and witness thought he had been hit. Noah kept shooting, firing, the witness thought, three shots in the store. Mean time defendant ran out of the store. He got out his pistol, but did not shoot in the house, so far as the witness saw,— his pistol seemed to be out of order. Noah followed to the door as the defendant passed out, presented his pistol, and fired in the direction that defendant had gone. About this time Constable Bud Bennett ran up and pushed Noah back, after which the witness heard two shots fired from the outside of the house, the last of which struck Bud Bennett's pocket. Noah was then inside of the store.

Bud Bennett testified, for the State, that he was in the rear of Hill's store when the difficulty occurred between the defendant and Jim Noah. He heard the first shot, and thought it was fired from

a toy pistol. As other shots followed, he rose from his seat and saw the defendant go out at the front door; to which point Noah advanced. Witness ran up, pushed Noah back, arrested him and placed him in charge of Mr. Golden. When witness reached the front door he saw the defendant, with his pistol drawn, to the right of the door, behind some barrels and boxes. Witness called to him not to shoot, as Noah was under arrest. Nevertheless he fired two shots, the last one striking the witness's pants pocket. When these two shots were fired by the defendant, Noah was in the store, near the back door and under arrest. After the defendant's last shot, witness arrested him and placed him in charge of Doctor Ohair.

Ben Balio, a brother-in-law to Jim Noah, testified that he was distant from the shooting some fifty or sixty yards, and did not see the first of it. He saw the defendant fire two shots from the outside towards the front door of Hill's store, but did not see who he was shooting at.

James Noah was the next witness for the State. He prefaced his testimony by the statement that, as he was an interested party, he would tell nothing except in answer to questions. Witness was in Grand View on December 13, 1884. He had been told that, on the day previous, in John Ross's store, the defendant had denounced him as a "d—d thieving son-of-a-b—h," applying to him, at the same time, almost every other conceivable abusive epithet. During the morning witness stepped into Hill's store to buy some sugar, coffee and flour. As he entered he saw the defendant with his hands up to his breast, and, the witness thought, in his breast pockets, and Jim Hill in the store, talking. Witness then asked defendant if what he said on the day before was intended for him. Defendant immediately fronted witness, threw his hand to his hip pocket, drew his pistol, and said, "Yes, by G—d." Witness said to him: "Then, G—d d—n you, face me in it like a man;" whereupon the defendant fired, and the witness returned the fire instantly. Defendant then ran out of the house. Witness knew positively that defendant fired first, for he intended to give, and did give, the defendant the first shot. Witness did not fire a single shot at the defendant after he left the house, but did shoot at him three times in the house. After his last shot he was arrested by Bennett, and after his arrest he was shot at twice by the defendant. Witness was arrested before the defendant's last two shots, and was under arrest, and making no effort to shoot, when those two shots were fired by the defendant. Defendant and witness had been unfriendly for four or five years.

James Sullivan, who went into Hill's store with Noah when the difficulty occurred, gave substantially the same account of it as did Noah. He did not know that a fight was impending when he went into the store. He saw Noah secure his pistol when he went to town that morning, but nothing was said of Boles or a prospective difficulty.

Dr. Ohair testified, for the State, in substance, that he was some sixty yards distant when the firing commenced, and started to go to the scene immediately, but was cut off by the passage of a freight train. He, however, saw the defendant from the outside fire two shots towards the front door of Hill's store. When witness reached the point of the difficulty, the officers were attempting to disarm the defendant. On his arrival, the defendant turned his pistol over to him, witness, and Bennett turned defendant over to the custody of the witness. Late in the evening witness surrendered defendant and his pistol to Deputy Sheriff Hutchins. Witness did not know at whom the defendant fired the two shots mentioned. Defendant and Noah had been enemies four or five years. The State closed.

Mr. May, the first witness for the defense, testified that he was a clerk in Hill's store at the time of the difficulty. Defendant and Jim Hill were standing in the store, talking, when Noah came in. As soon as he came in, Noah asked defendant something about talking about him, and asked him if he did so. Defendant answered either: "Yes, I did," or "Yes, by G—d," and Noah instantly fired at him. Witness did not see defendant either fire a shot or draw a pistol in the house. Witness ran out of the store as soon as Noah fired.

A. J. Ingle was the next witness for the defense. He testified that he saw the difficulty. Boles was in Hill's store. Noah went in and asked him what he had said about him. Defendant made some reply, and Noah fired on him. Defendant then drew his pistol and tried to shoot, but, as the pistol proved to be out of order, he ran out of the store. It was the opinion of the witness that Noah fired three shots in the house, and that the defendant did not fire a single shot in the house. He ran out of the house with his pistol in his hand. Witness heard two shots fired from the outside shortly afterwards, but did not know by whom they were fired.

Justice of the Peace Humphries testified, for the defense, that he was holding court in the back part of Hill's store when the shooting occurred. He thought that the first shot he heard was a fire-cracker, but, as the shooting continued, he started towards the front door

and saw the defendant going out, with his pistol in his hand. At the same time he saw Noah near the door with his pistol in his hand. About this time Bennett pushed Noah back, looked out of the door, and said: "You Jeff! You Jeff!" About that time the witness heard a shot fired from the outside, but did not know who fired it. As he went towards the front door witness met Noah, and told him that he would have to put him under arrest. Noah replied: "All right, but you will have to protect me or give me another pistol to defend myself; mine is empty." As witness was returning to the back part of the store, he met the witness Sullivan, who asked if he had not better make a complaint against the defendant.

Mr. Hutchins testified that he arrived on the scene some time after the difficulty. Bennett and Doctor Ohair surrendered the defendant and his pistol to witness. The pistol was a five-shooter, from which two shots had been fired.

The special charge referred to in the head-note as having been erroneously refused reads as follows:

"By the terms *coupled with an ability to commit*, as used above, is meant: 1. That the person making the assault must be in such a position that, if not prevented, he may inflict a battery upon the person assaulted. 2. That he must be within such distance of the person so assailed as to make it within his power to commit the battery by the use of the means with which he attempts the battery. 3. It follows that one who is at the time of making an attempt to commit a battery under such restraint as to deprive him of the power to act, or who is at so great a distance from the person assailed as that he cannot reach his person by use of the means with which he makes the attempt, is not guilty of an assault."

The motion for new trial raised the question discussed in the opinion.

*Poindexter & Padelford*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. Appeal in this case is from a judgment of conviction for an aggravated assault, the penalty being assessed at a fine of $250.

The charge of the court to the jury was excepted to, and special requested instructions were asked for defendant, and were refused. We are of opinion that some important portions of the charge were erroneous, and are also of opinion that the greater portion, if not all, of the requested instructions should have been given. Under the

evidence it is quite probable, if not entirely certain, that Noah, the party charged to have been assaulted, was out of reach and danger from the shots of defendant, when he fired his pistol. The court charged the jury as to the statutory definition of an assault (Penal Code, art. 484), but failed to explain what is meant by the terms "coupled with an ability to commit," as used in the statutory definition. Such an explanation was peculiarly called for by the facts of this case, and defendant's special instruction No. 2, which was refused, attempted to supply this omission in the general charge, and said instruction was, moreover, a literal copy of article 489, Penal Code. (*Jarnigan* v. *The State*, 6 Texas Ct. App., 465.)

Other portions of the charge are objectionable, but we do not feel called upon to discuss them. Suffice it to say that defendant's special instructions embodied the law with reference to all legitimate phases of the case as shown by the evidence, and if they had been given entirely, without any further or additional charge from the court, as a charge they would have been sufficient.

Because the charge was erroneous, and because the special instructions should have been given, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[Opinion delivered June 10, 1885.]